# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ABRAHAM SHAFI and GENRIKH KHACHATRYAN, individually and derivatively, on behalf of GET TOGETHER INC., and KRUTAL DESAI, ELIJAH CHANCEY, INOU RIDDER, ALIA SHAFI, KUNAL LAKHAN-PAL, JACOB SHAFI, SHEHAB AMIN, and NOAH SHAFI, | ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2023-1157-LWW |
| CHI-HUA CHIEN; SERENA DAYAL; MIKE MAPLES, JR.; SCOTT KAUFFMAN; GOODWATER CAPITAL, LLC; GOODWATER CAPITAL III, L.P.; SB INVESTMENT ADVISERS (US) INC. (aka SOFTBANK INVESTMENT ADVISERS); FLOODGATE FUND V, L.P., and GET TOGETHER INC., | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) ) | |
| GET TOGETHER INC., | ) ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: November 15, 2024
Date Decided: March 3, 2025

Kevin M. Coen & Courtney Kurz, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Stephen Shackelford, Jr., Shawn Rabin & Eve Levin, SUSMAN GODFREY L.L.P., New York, New York; Kemper Diehl, SUSMAN GODFREY L.L.P., Seattle, Washington; *Counsel for the Plaintiffs*

Elena C. Norman, Daniel M. Kirshenbaum & Alex B. Haims, YOUNG CONAWAY STARGATT & TAYLOR LLP, Wilmington, Delaware; Alexander J. Willscher, SULLIVAN & CROMWELL LLP, New York, New York; Brendan P. Cullen, SULLIVAN & CROMWELL LLP, Palo Alto, California; *Counsel for Defendants Serena Dayal and SB Investment Advisers (US) Inc. (aka SoftBank Investment Advisers)*

Elena C. Norman, Daniel M. Kirshenbaum & Alex B. Haims, YOUNG CONAWAY STARGATT & TAYLOR LLP, Wilmington, Delaware; Benjamin Kleine, KLEINE PC, San Francisco, California; *Counsel for Defendants Mike Maples, Jr. and Floodgate Fund V, L.P.*

Matthew F. Fischer, Jacqueline A. Rogers & Eric J. Nascone, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Anna Erickson White & Christin Hill, MORRISON & FOERSTER LLP, San Francisco, California; *Counsel for Defendants Scott Kauffman and Get Together Inc.*

A. Thompson Bayliss, E. Wade Houston & S. Michael Blochberger, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Michael D. Celio, GIBSON, DUNN & CRUTCHER LLP, Palo Alto, California; Mark H. Mixon, Jr., GIBSON, DUNN & CRUTCHER LLP, New York, New York; *Counsel for Defendants Chi-Hua Chien, Goodwater Capital, LLC, and Goodwater Capital III, L.P.*

**Will, Vice Chancellor**

This action is brought by the founders and certain common stockholders of Get Together, Inc., a startup company with a novel social media platform. The company took on venture capital investors through several funding rounds. In exchange for sizeable investments, three venture capital firms received shares of preferred stock, and each gained the right to elect one director to the company's board. The other three board votes were held by directors elected by common stockholders.

The company's investors were sold the promise of a thriving social media app. But rumors began to swirl that the social media platform was populated by bots with few active human users. The Securities and Exchange Commission launched an investigation into the matter.

The three venture capital-affiliated directors proceeded to remove the co-founder who served as CEO and installed an outsider to that role. That newly appointed CEO, acting as a voting proxy for the common stockholders, then voted to remove the co-founder from the board and elect himself to the vacancy. Days later, the directors voted to dissolve the company, citing a newly obtained consultant report that concluded the social media platform was overrun with bots. The dissolution allowed the preferred stockholders to access the company's remaining $40 million in cash—less than their total investments—through their liquidation preferences. The common stockholders received nothing.

These facts give rise to two dramatically different stories.

According to the plaintiffs, the venture capital firms and their director designees panicked over the SEC investigation and feared reputational damage in Silicon Valley that would impair future investment prospects. To shield themselves, they blamed the co-founder and commissioned a sham report about bots on the platform as cover. By hastily dissolving IRL without regard to the common stockholders, they cut their losses and could focus on more profitable endeavors.

The defendants, however, insist that the co-founder sold them a bill of goods. They maintain that the social media platform was a hoax because its users were almost entirely bots. In their view, the co-founder was appropriately suspended for misconduct and removed from his CEO and board positions. They believe that shutting down the company promptly was the only responsible path for all investors.

At this stage, in resolving the defendants' motion to dismiss, I cannot determine which story is accurate. Some of the plaintiffs' theories rest only on aspersions about the startup and venture capital communities, which fall short of their pleading burden. But others are supported by well-pleaded facts, which I must accept as true, that bolster the plaintiffs' tale.

Most of the plaintiffs' claims survive. A few claims are non-viable, which I dismiss. Discovery will be necessary to determine the truth about Get Together's demise.

## I.     FACTUAL BACKGROUND

Unless otherwise noted, the following facts are drawn from the Verified Amended Complaint (the "Complaint") and the documents it incorporates by reference.[1]

### A.     IRL's Founding and Funding

Get Together Inc. is a startup founded by Abraham Shafi, Krutal Desai, and Genrikh "Henry" Khachatryan in 2016.[2]  Shafi served as its CEO and Desai as its President.[3]  Get Together's founders had a vision of creating a new social media network that would help members form connections "in real life."[4]  After raising seed funding in 2016, the founders began to build out a social media platform and app called In Real Life (or IRL).[5]

IRL raised $8 million in a 2018 Series A investment round and $16 million in a 2019 Series B round.[6]  These funding rounds were led by Goodwater Capital, a

---

[1] Verified Am. Compl. (Dkt. 35) ("Compl.").

[2] *Id.* ¶ 36.  Get Together, Inc. was a Delaware corporation before its dissolution.  *Id.* ¶ 55. It is referred to in this decision as "IRL."  *See id.* ¶ 2 n.1.

[3] *Id.* ¶¶ 37-38.

[4] *Id.* ¶ 59.

[5] *Id.*

[6] *Id.* ¶ 63.

venture capital firm founded and run by Chi-Hua Chien.[7] Floodgate Fund, a venture capital firm co-founded and led by Mike Maples, invested in both rounds.[8]

In May 2021, IRL closed a Series C round, raising $170 million at a $1.17 billion post-money valuation.[9] SB Investment Advisors (US) Inc., an affiliate of SoftBank Group, invested $150 million.[10] SoftBank's investment was led by Serena Dayal, a Director at SB Investment Advisors.[11]

## B.    IRL's Board

IRL's Board of Directors has six seats. The company's Amended and Restated Certificate of Incorporation allocated three Board seats to directors elected by common stockholders, which included IRL's founders, employees, and earliest investors.[12] The other three Board seats were allocated to directors elected by certain

---

[7] *Id.* ¶¶ 47, 63. "Goodwater" refers to Goodwater Capital, LLC and to Goodwater Capital II, L.P., which invested in IRL. *Id.* ¶ 47.

[8] *Id.* ¶¶ 49, 63. "Floodgate" refers to Floodgate Fund and to Floodgate Fund V, L.P., which invested in IRL. *Id.* ¶ 49.

[9] *Id.* ¶ 69.

[10] *Id.* ¶¶ 51, 64. Defendant SB Investment Advisors (US) Inc. was the investment manager for SoftBank Vision Fund 2 at the time of IRL's Series C round. SoftBank Vision Fund 2 invested in IRL through an entity called SVF II Aggregator (DE), LLC. These entities are referred to as "SoftBank." *Id.* ¶ 51.

[11] *Id.* ¶ 48.

[12] *Id.* ¶ 70; *see also* Trans. Aff. of Alex B. Haims in Supp. of Defs.' Opening Br. in Supp. of Mot. to Dismiss (Dkt. 46) ("Defs.' Ex.") Ex. C (Am. and Restated Voting Agreement ("Voting Agreement")) § 1.1 (stating that the Board would remain at six directors); *id.* § 1.2(d) (explaining that the "Common Stock Directors" would be elected by common stockholders "voting as a separate class").

4

preferred stockholders.[13]   If there were fewer than three common stockholder directors on the Board, the seated common stockholder directors would retain voting power equal to three votes.[14]

After the Series C round, the Board had five members.   The common stockholder directors were founders Shafi and Desai (each with 1.5 votes).[15]   An Amended and Restated Voting Agreement (the "Voting Agreement") gave Goodwater, Floodgate, and SoftBank (together, the "VC Funds") each the right to designate one director.[16]   Goodwater appointed Chien, Floodgate appointed Maples, and SoftBank appointed Dayal (together, the "VC Directors").[17]

## C.   IRL's Progress

In September 2021, IRL reported ongoing user growth to its Board of approximately 3.8 million daily active users and 14 million monthly active users.[18] This was an increase from the 3 million daily active users and 13 million active users

---

[13] Compl. ¶ 70; *see also* Voting Agreement § 1.2(a)-(c).

[14] Compl. ¶ 70.

[15] *Id.*

[16] *Id.*; *see also* Voting Agreement §§ 1.2(a) (Floodgate), 1.2(b) (Goodwater), 1.2(c) (SoftBank).

[17] Compl. ¶ 70.

[18] *Id.* ¶ 72; *cf.* Defs.' Ex. A (Series C Preferred Stock Purchase Agreement) § 2.8(e).

IRL disclosed in soliciting Series C investors.[19]  IRL was one of the top ten most downloaded social media apps on Apple's mobile operating system at the time.[20]

In December 2022, IRL launched a new meme-generating app called Memix.[21]  Memix allowed users to create and share memes on social media.  It was ranked among the top free apps in the Apple App Store shortly after its launch.[22]

### D.    The SEC Investigation

In early 2022, certain IRL employees raised allegations that IRL's user base was "substantially inflated by bots."[23]  That spring, tech-focused publication *The Information* reported that IRL employees had "expressed concern to managers about the usage figures the company ha[d] touted."[24]  "[T]wo people with direct knowledge" conveyed that IRL "may have used an unconventional definition [of active users] to make the app appear bigger than it is."[25]

Three months later, in August 2022, the Securities and Exchange Commission subpoenaed IRL for information about its user statistics.[26]  IRL hired outside counsel

---

[19] *Id.* ¶ 60.

[20] *Id.* ¶ 61.

[21] *Id.* ¶¶ 73-74.

[22] *Id.* ¶ 74.

[23] *Id.* ¶ 85.

[24] *Id.* ¶ 86.

[25] *Id.*

[26] *Id.* ¶ 87.

to respond to the SEC's inquiry—first retaining Cooley LLP, then Faegre Drinker Biddle & Reath LLP.[27]

In December 2022, after IRL retained Faegre, Cooley warned the VC Directors of their risk of exposure from the SEC's investigation.[28] The VC Directors and their affiliated funds were concerned about the potential ramifications.[29] But on January 27, 2023, Faegre provided its initial assessment that "concerns about a significant bot problem on IRL's platform were unfounded."[30] Faegre further investigated the bot allegations with the assistance of technology consulting firm Celerity and, in April, it concluded that the allegations were baseless.[31]

### E. The Special Committee

On January 25, 2023, IRL's Board unanimously established a Special Committee to oversee IRL's response to the SEC investigation and examine the allegations about IRL's active user population.[32] The Board appointed Chien, Dayal,

---

[27] *Id.* ¶ 88.

[28] *Id.* ¶ 93.

[29] *See, e.g., id.* ¶¶ 90-92, 94, 262.

[30] *Id.* ¶ 95.

[31] *Id.* ¶ 97.

[32] *Id.* ¶ 118; *see* Defs.' Ex. D (Action by Unanimous Written Consent of the Board of Get Together, Inc.).

and Maples to the Special Committee.[33]  The Special Committee retained outside counsel to advise it.[34]

At this point, the SEC had not made any allegations of wrongdoing or misconduct.  Its investigation was ongoing, and IRL was cooperating.[35]  Both Chien and Dayal were deposed by the SEC in April 2023.[36]

### F.    Shafi's Suspension

Two days after Chien's SEC deposition, the VC Directors met with Shafi.[37] They told Shafi that unless he immediately resigned as IRL's CEO, he would be suspended and IRL would issue a press release describing his "pattern of misconduct" related to his use of an IRL credit card for personal expenses.[38]

When Shafi refused to resign, the Special Committee told him on April 28, 2023 that he was suspended as CEO.[39]  The Special Committee then appointed

---

[33] Compl. ¶ 118.

[34] *Id.* ¶ 122.

[35] *Id.* ¶ 121; *see id.* ¶ 12.

[36] *Id.* ¶ 123.

[37] *Id.* ¶ 124.

[38] *Id*.

[39] *Id.* ¶ 125.

8

outsider Scott Kauffman as IRL's CEO.[40] Kauffman had a longstanding relationship with Chien.[41]

The same day, *The Information* published an article with the headline "IRL's CEO Steps Down After Allegation of Inflated User Numbers."[42] It reported that Shafi "stepped down . . . following allegations that the company used bots to inflate the users it reported publicly and to investors, according to a person with direct knowledge."[43] Two days later, *The Information* published another article stating that "[a] special committee of messaging app IRL's board of directors suspended CEO Abraham Shafi . . . after receiving a report from outside counsel that outlined a pattern of misconduct by Shafi" according to "an IRL spokesperson."[44]

## G. IRL's Collapse

Between the end of April when Shafi was suspended and early May 2023, IRL's daily user population plummeted. IRL suffered a technical incident from April 26 to April 28 that did not affect user activity.[45] But additional outages occurred between May 9 and 14, each taking the platform offline for several days

---

[40] *Id.* ¶ 140.

[41] *Id.* ¶¶ 145-46.

[42] *Id.* ¶ 131.

[43] *Id.*

[44] *Id.* ¶¶ 132-33.

[45] *Id.* ¶ 154.

and causing significant drops in users.[46]  After another outage incident in mid-May, IRL's active users fell to under 50,000.[47]  Some users expressed frustration and displeasure with the app experience in online reviews.[48]

IRL employees grew disillusioned.[49]  Some felt that Kauffman was an ineffective leader.[50]  Although a plan to fix the platform and reengage users was developed by senior IRL employees, Kauffman refused to implement it.[51]  IRL's advertising spending suddenly ceased.[52]  Memix, too, was in limbo.[53]

## H.    Board Dissension

On June 1, 2023, Desai called an emergency Board meeting for June 8.[54]  He announced one agenda item: "the strategic direction of the company and the company's best interests in light of the recent decision by the Special Committee regarding Scott Kauffman as CEO and President."[55]

---

[46] *Id.* ¶¶ 156-58.

[47] *Id.* ¶ 159.

[48] *Id.* ¶¶ 160-61.

[49] *Id.* ¶ 163.

[50] *Id.* ¶¶ 163-64.

[51] *Id.* ¶ 167.

[52] *Id.* ¶ 164.

[53] *Id.* ¶¶ 171-73.

[54] *Id.* ¶ 178.

[55] *Id.*

During the meeting, Desai expressed "his belief that IRL had real value and that Kauffman's management was threatening it."[56] The VC Directors conveyed both their willingness to consider Desai's feedback and their confidence in Kauffman.[57] Chien also asked that Shafi resign from the Board. Shafi refused.[58]

### I. The Keystone Report

By this point, the Special Committee had commissioned consulting firm Keystone Strategy to "analyze user activity on the IRL platform to confirm the presence of bot accounts."[59] Keystone's investigation report (the "Keystone Report"), dated June 22, 2023, stated that it had found extensive suspicious user behavior and clear signs of bot activity on the IRL platform.[60]

Keystone's work was allegedly rushed, contradictory, unreliable, and at odds with prior reported data.[61] Keystone extracted IRL user data from an experimental database despite its understanding that a different database was the "source of truth

---

[56] *Id.* ¶ 183.

[57] *Id.* ¶ 184.

[58] *Id.*

[59] Defs.' Ex. F (Keystone Strategy, Findings Regarding Bot Activity on the IRL Platform dated June 21, 2023 ("Keystone Report")); *see* Compl. ¶ 188.

[60] Keystone Report 3.

[61] *See* Compl. ¶¶ 9-10, 189-210 (discussing alleged problems with Keystone's work and report).

11

for counting active users."[62]   As a result, Keystone could not accurately verify whether between 45% and 65% of the IRL data reflected human or bot activity.[63]

## J.    IRL's Dissolution

On June 12, 2023, Chien called a special meeting of the Board for June 20 "to discuss the conclusion of the Special Committee's investigation."[64]  Three days later, on June 15, the VC Directors formed an entity called IRL LIQUIDATION, LLC.[65] They had allegedly decided that it was best for their affiliated funds to shut IRL down.[66]

During the June 20 Board meeting, the Special Committee disclosed Keystone's findings to Shafi and Desai, who had been unaware of Keystone's retention.[67]  The Special Committee reported that Keystone had concluded 95% of the users on IRL's platform since mid-2022 were bots.[68]

---

[62] *Id.* ¶ 190.

[63] *Id.* ¶¶ 194-95; Keystone Report ¶ 32.

[64] Compl. ¶ 204.

[65] *Id.* ¶ 205.

[66] *Id.* ¶¶ 186-87.

[67] *Id.* ¶ 206.

[68] *Id.*

Two days later, on June 22, the VC Directors called another special meeting of the Board for the next day.[69] The purpose of the meeting was to consider a proposed resolution to dissolve the Company.[70] Desai and Shafi were taken aback.[71]

Desai expressed his confusion over the conflicting information about bots provided by Faegre and Keystone, which he felt the Special Committee needed to address.[72] Desai also asked whether the Special Committee had "an estimation of the potential net proceeds from a sale of the company, as referenced in the proposed resolution."[73] Shafi objected to the conclusions in the Keystone Report and to the timing of the dissolution vote.[74]

The same day, the Special Committee's counsel emailed IRL's co-founders (Desai, Shafi, and Khachatryan) and one other common stockholder to request that they sign a unanimous written consent removing Shafi from the Board and electing Kauffman in his place.[75] The email requested that the consent be executed and

---

[69] *Id.* ¶ 213.

[70] *Id.*

[71] *Id.* ¶¶ 214-17.

[72] *Id.* ¶ 214 (Desai: "until Tuesday it was my understanding that bots were not a significant problem on the app").

[73] *Id.* ¶ 215.

[74] *Id.* ¶ 217.

[75] *Id.* ¶ 219.

returned within 24 hours.[76]  When that time passed without a response from Desai, Shafi, or Khachatryan, counsel circulated a consent executed by Kauffman as a purported proxy for the common stockholders.[77]  In doing so, Kauffman sought to remove Shafi and elect himself to a common stockholder designated Board seat, with the associated 1.5 Board votes.[78]

The newly-reconstituted IRL Board—consisting of the three VC Directors, Desai, and Kauffman—met on June 23, shortly after Kauffman had signed the consent.[79]  At the meeting, the VC Directors told Desai that they "had to shut down and dissolve the Company right away."[80]  Their reasoning was that "they had heard that [] Shafi was going to talk to the press, and they had to beat him to the punch."[81]  The Board (including Desai) then proceeded to vote unanimously to dissolve IRL.[82]  IRL had approximately $40 million in cash at the time, which would be distributed to investors.[83]

---

[76] *Id.*

[77] *Id.* ¶ 220.

[78] *Id.* ¶ 228.

[79] *Id.* ¶ 229.

[80] *Id.* ¶ 233.

[81] *Id.*

[82] *Id.* ¶ 234.

[83] *See id.* ¶¶ 11, 149, 168.

After the Board's dissolution vote, an IRL spokesperson issued a press release. It explained that an investigation by the Board had found 95% of IRL's users were bots.[84] Kauffman sent a letter to IRL's stockholders with similar information.[85]

The story made headlines in various publications. For example, on June 23, *The Information* announced that IRL was shutting down and cited IRL's statement that the platform was overrun with bots.[86] The article also suggested that Shafi might be linked to the problem, mentioning that the closure came two months after his suspension for "alleged misconduct."[87] Other news outlets took a similar spin.[88]

## K.    The California Action

On July 31, 2023, SoftBank—IRL's largest investor—sued Shafi and members of his family in federal district court in California (the "California Action").[89] SoftBank alleged that Shafi defrauded IRL's investors to enrich himself

---

[84] *Id.* ¶ 236.

[85] *Id.* ¶ 238; *see* Defs.' Ex. G (Kauffman's letter to stockholders).

[86] Compl. ¶ 239.

[87] *Id.*

[88] *Id.* ¶¶ 240-44.

[89] *See* Defs.' Ex. H (Compl., *SVF II Aggregator (DE) LLC v. Shafi, et al.*, No. 4:23-cv-03834-YGR (N.D. Cal.) (ECF No. 1)); *see also In re Rural Metro Corp. S'holders Litig.*, 2013 WL 6634009, at *7 (Del. Ch. Dec. 17, 2013) ("Delaware courts have taken judicial notice of publicly available documents that 'are required by law to be filed, and are actually filed, with federal or state officials.'" (quoting *In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563, 584 (Del. Ch. 2007))).

15

and his family, causing SoftBank to suffer substantial losses.[90] SoftBank's theory is that Shafi used bots to inflate the number of IRL's active users at the time that SoftBank invested in the Series C round and misrepresented IRL's active user growth.[91]

On May 2, 2024, the federal court denied Shafi's motion to dismiss in part—including as to SoftBank's claims for fraud—and granted the motion in part with leave to amend.[92] Claims against the other defendants were dismissed with leave to amend.[93]

SoftBank filed an amended complaint in the California Action on June 3, 2024.[94] The California defendants again moved for dismissal.[95] Their motion to dismiss the amended complaint was recently granted in part and denied in part.[96]

---

[90] Defs.' Ex. H ¶ 13.

[91] *Id.* ¶¶ 4, 7.

[92] Defs.' Ex. J (Order Granting in Part and Den. in Part Mot. to Dismiss, *Shafi*, No. 4:23-cv-03834-YGR (ECF No. 69)).

[93] *Id.*

[94] Am. Compl., *Shafi*, No. 4:23-cv-03834-YGR (ECF No. 70) ("Cal. Compl.").

[95] Defs.' Omnibus Notice of Mot. and Mot. to Dismiss Pl.'s Compl., *Shafi*, No. 4:23-cv-03834-YGR (ECF No. 88).

[96] Order Granting in Part and Den. in Part Mot. to Dismiss, *Shafi*, No. 4:23-cv-03834-YGR (ECF No. 97); *see* Dkt. 73 (counsel in this action informing me of the California order).

## L.    This Action

On November 15, 2023, Shafi and co-founder Khachatryan filed direct claims and derivative claims on behalf of IRL in this court.[97]   They named as defendants Goodwater, SoftBank, Floodgate, Chien, Dayal, Maples, and Kauffman.  After the defendants moved to dismiss or stay the case, an amended complaint (the operative "Complaint") was filed.[98] In addition to Shafi and Khachatryan, co-founder Desai joined as a plaintiff, along with seven holders of IRL stock options.  IRL was added as a defendant.

The Complaint asserts three derivative and five direct claims:

- Count I is a breach of fiduciary duty claim brought by Shafi and Khachatryan derivatively on behalf of IRL against the VC Directors for removing Shafi, installing Kauffman, and shutting down IRL;[99]

- Count II is a breach of fiduciary duty claim brought by Shafi, Desai, and Khachatryan against the VC Directors for violating IRL's bylaws by appointing Kauffman CEO;[100]

- Count III is a breach of fiduciary duty claim brought by Shafi and Khachatryan derivatively on behalf of IRL against Kauffman for damaging IRL's business;[101]

---

[97] Dkt. 1.

[98] Dkts. 32, 35.

[99] Compl. ¶¶ 265-78 (seeking damages on behalf of IRL).

[100] *Id.* ¶¶ 279-82 (seeking damages on behalf of the plaintiffs).  Desai only brings this claim against Chien and Maples.  *Id.* at 113 n.12.  He does not assert any claims against SoftBank and Dayal, or any claims derivatively on behalf of IRL.  *Id.* at 140 n.14.

[101] *Id.* ¶¶ 283-92 (seeking damages on behalf of IRL).

- Count IV is a claim for breach of IRL's Voting Agreement brought by Shafi, Desai, and Khachatryan against IRL for Kauffman's vote as a proxy for common stockholders;[102]

- Count V is a claim for vicarious liability and respondeat superior brought by Shafi and Khachatryan derivatively on behalf of IRL against the VC Firms;[103]

- Count VI is a claim for tortious interference with prospective economic advantage brought by all ten plaintiffs against all defendants for impairing the value of stock options;[104] and

- Count VII and VIII are claims for defamation and false light invasion of privacy brought by Shafi against the VC Directors and Kauffman for making false statements about Shafi's "pattern of misconduct."[105]

On May 24, 2024, the defendants moved to dismiss the Complaint or stay it in deference to the resolution of the California Action.[106] The plaintiffs filed an answering brief in opposition to the motion on July 10, and the defendants filed a reply brief on August 9.[107] Oral argument was presented on November 15.[108]

---

[102] *Id.* ¶¶ 293-303 (seeking damages on behalf of plaintiffs).

[103] *Id.* ¶¶ 304-09 (asserting that the venture funds are liable to IRL for damages).

[104] *Id.* ¶¶ 310-19 (seeking damages on behalf of plaintiffs).

[105] *Id.* ¶¶ 320-49 (seeking damages on behalf of Shafi).

[106] Defs.' Consol. Opening Br. in Supp. of Defs.' and Nominal Def.'s Mots. to Dismiss or Stay Pls.' Am. Verified Compl. (Dkt. 46) ("Defs.' Opening Br.").

[107] Pls.' Answering Br. in Opp'n to Defs.' and Nominal Def.'s Mots. to Dismiss or Stay Pls.' Am. Verified Compl. (Dkt. 51) ("Pls.' Answering Br."); Defs.' Reply Br. in Supp. of Defs.' and the Nominal Def.'s Mots. to Dismiss or Stay Pls.' Am. Verified Compl. (Dkt. 55) ("Defs.' Reply Br.").

[108] *See* Tr. of Oral Arg. on Defs.' and Nominal Def.'s Mots. to Dismiss or Stay Pls.' Am. Verified Compl. (Dkt. 70) ("Hr'g Tr.").

During oral argument, I raised sua sponte that the Court of Chancery lacks subject matter jurisdiction over defamation and false light claims.[109] The plaintiffs subsequently filed a proposed order to transfer Counts VII and VIII to the Superior Court.[110] I granted that order and explained that I would request cross-designation to resolve those claims in the to-be-filed Superior Court action.[111]

## II.    ANALYSIS

The arguments in the defendants' motion fall into three categories. First, they argue that the derivative claims (Counts I, III, and V) must be dismissed for failure to plead demand futility. Second, they argue that the plaintiffs have failed to state any direct claims (Counts II, IV, and VI) on which relief can be granted. And third, they argue in the alternative that this action should be stayed in deference to the California Action.

---

[109] *Id.* at 6; *see Perlman v. Vox Media, Inc.*, 2019 WL 2647520, *5 (Del. Ch. June 27, 2019), *aff'd*, 249 A.3d 375 (Del. 2021) ("[D]efamation [i]s a claim uniquely suited for adjudication by a law court . . . ."); *see also Preston Hollow Cap. LLC v. Nuveen LLC*, 2019 WL 3801471, at *9-10 (Del. Ch. Aug. 13, 2019) (dismissing a defamation claim for lack of subject matter jurisdiction); 10 *Del. C.* § 342 ("The Court of Chancery shall not have jurisdiction to determine any matter wherein sufficient remedy may be had by common law, or statute, before any other court or jurisdiction of this State.").

False light invasion of privacy is a variant of defamation. *See Ryle v. Outen*, 2024 WL 66022, at *5 (Del. Super. Jan. 5, 2024), *aff'd*, 327 A.3d 1087 (Del. 2024); Restatement (Second) of Torts § 652E (1977) (noting that an action for false light affords "an alternative or additional remedy" to a claim of defamation).

[110] Dkt. 71.

[111] Dkt. 72.

19

I begin by assessing the plaintiffs' derivative claims. I conclude that demand is excused because, among other reasons, a majority of Board faces a substantial likelihood of liability for breach of fiduciary duty (on Counts I and III). But I dismiss the plaintiffs' vicarious liability claim (Count V) because it fails as a matter of law.

On the direct claims, I conclude that two survive and one fails. The claims for breach of fiduciary duty for bylaw violations (Count II) and for breach of the Voting Agreement (Count IV) state viable claims. The tortious interference claim (Count VI) does not and is dismissed.

Finally, I decline to stay this action in deference to the California Action.

## A. Derivative Claims and Demand Futility

"[T]he decision whether to initiate or pursue a lawsuit on behalf of the corporation is generally within the power and responsibility of the board of directors."[112] A stockholder may pursue claims on a corporation's behalf only "if (1) the corporation's directors wrongfully refused a demand to authorize the corporation to bring the suit or (2) a demand would have been futile because the directors were incapable of impartially considering the demand."[113] The plaintiffs here invoke the latter approach.

---

[112] *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 120 (Del. Ch. 2009).

[113] *Firemen's Ret. Sys. of St. Louis on behalf of Marriott Int'l, Inc. v. Sorenson*, 2021 WL 4593777, at *6 (Del. Ch. Oct. 5, 2021).

Under Court of Chancery Rule 23.1, a plaintiff who forgos making a litigation demand on the corporation's board must plead "particularized facts" supporting a reasonable inference that "demand is excused because the board is incapable of exercising its power and authority to pursue the derivative claims directly."[114] Conclusory allegations will not suffice.[115]

To assess demand futility, this court applies the "universal" three-part test established in *United Food & Commercial Workers Union v. Zuckerberg*.[116] The court asks, on a director-by-director and claim-by-claim basis:

> (i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;
>
> (ii) whether the director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; and
>
> (iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would

---

[114] *White v. Panic*, 783 A.2d 543, 551 (Del. 2001) (emphasis omitted; citation omitted); *see also Brehm v. Eisner*, 746 A.2d 244, 256 (Del. 2000).

[115] *E.g.*, *Greenwald v. Batterson*, 1999 WL 596276, at *4 (Del. Ch. July 26, 1999) ("In weighing the adequacy of the complaint under Rule 23.1, 'only well-pleaded allegations of fact may be accepted as true; conclusory allegations of fact or law not supported by allegations of specific fact may not be taken as true. A trial court need not blindly accept as true all allegations, nor must it draw all inferences from them in plaintiffs' favor unless they are reasonable inferences.'" (quoting *Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988))).

[116] 262 A.3d 1034 (Del. 2021).

> face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.[117]

If "the answer to any of the questions is 'yes' for at least half of the members of the demand board, then demand is excused as futile."[118]

When this action was filed, IRL's Board had five members: Desai, Maples, Chien, Dayal, and Kauffman. Kauffman and Desai each had 1.5 Board votes; Maples, Dayal, and Chien each had one vote. The plaintiffs do not claim that Desai was incapable of impartially considering a demand. They focus on the other four Board members.

The plaintiffs raise various arguments about the partiality of these directors. They say that the VC Directors received material personal benefits from the alleged misconduct; that the VC Directors lacked independence from their affiliated VC Funds, which received material personal benefits from the alleged misconduct; and that the VC Directors and Kauffman each face a substantial likelihood of liability for the derivative claims in the Complaint.[119] Although the plaintiffs organize their arguments by the *Zuckerberg* prongs, there is significant overlap. For example, the misconduct allegedly provided material benefits to both the directors and the funds from which they lack independence, while causing harm to the company and

---

[117] *Id*. at 1059.

[118] *Id.*

[119] *See* Pls.' Answering Br. 16-48.

22

common stockholders that triggers liability for breach of fiduciary duty claims. I therefore address the plaintiffs' demand futility arguments thematically and claim by claim, rather than follow a duplicative box-checking exercise.

I conclude that demand futility has been established for Count I. The plaintiffs adequately plead that the VC Directors put their interests, and those of the VC Funds, ahead of common stockholders.

Demand is also futile on Count III. The plaintiffs' allegations about Kauffman either overlap with Count I such that the VC Directors could not impartially consider a demand or are sufficient to impugn Kauffman's decision-making.

Count V is a different matter. It rests on a flawed legal theory.[120] It is therefore dismissed.

### 1.    Breach of Fiduciary Duty Against the VC Directors

The plaintiffs contend that the VC Directors each "put their own personal and financial interests"—and those of the VC Funds—"ahead of those of the Company and its stockholders."[121] The VC Directors allegedly did so in a variety of ways— from appointing Kauffman to blaming Shafi for IRL's failings and commissioning the Keystone Report. According to the Complaint, these actions were sequenced

---

[120] *See infra* note 194 and accompanying text (setting out the Rule 12(b)(6) standard).

[121] Compl. ¶ 267.

steps in a scheme to dissolve IRL.[122] This scheme allegedly yielded material benefits for the VC Directors and the VC Funds, from which the VC Directors lack independence.[123]

According to the plaintiffs, as partners in their firms (Goodwater and Floodgate), Chien and Maples "received personal benefits whenever the funds did."[124] And Dayal, as a Director of SB Investment Advisors, was "beholden to SoftBank" for her pay and employment.[125] The VC Directors were thus dual fiduciaries, owing duties to their respective funds, on one hand, and to IRL and its stockholders, on the other hand.[126]

But dual fiduciary status alone is insufficient to demonstrate that a director lacks independence for demand futility purposes. A "potential conflict of interest" cannot rebut the presumption of impartiality, which applies with equal force to

---

[122] *E.g.*, *id.* ¶¶ 24-25 (discussing the "final act of [the VC Directors'] scheme" as "put[ting] forward a resolution to dissolve the Company"); *id.* ¶ 228 (describing the "removal of Abraham Shafi and appointment of Kauffman in his place on the Board" as "critical to the last part of the VC Directors' scheme").

[123] *E.g.*, *id.* ¶¶ 254, 257, 261.

[124] Pls.' Answering Br. 23-24.

[125] *Id*. at 25.

[126] *See id.* at 25-26 (discussing the "dual fiduciary problem" (quoting *Frederick Hsu Living Trust v. ODN Hldg. Corp.*, 2017 WL 1437308, at *27 (Del. Ch. Apr. 14, 2017))); *see also* Hr'g Tr. 15 (defense counsel conceding that the VC Directors were dual fiduciaries). Because Dayal's dual fiduciary status is conceded, I do not consider whether she is differently situated from Chien and Maples as a non-partner.

24

directors of early-stage startups and major public companies.[127] Instead, a plaintiff "must show that an actual conflict existed."[128]

The plaintiffs cite to several benefits that they believe created actual conflicts that motivated the VC Directors to breach their fiduciary duties and shutter IRL. First, they say that the VC Directors decided to "cut bait" on IRL so that the VC Funds could redirect their resources toward more profitable ventures.[129] Second, they assert that the VC Directors managed to protect their valuable reputations amid the SEC investigation.[130] And third, they argue that the VC Directors funneled IRL's remaining cash to the VC Funds, which had liquidation preferences as preferred stockholders.

The first two purported benefits are insufficient to establish demand futility. They hinge on broad assumptions about the venture capital industry rather than particularized allegations. But the third benefit supports an inference that, based on the facts alleged in the Complaint, the VC Directors face a substantial likelihood of

---

[127] *Cooke v. Oolie*, 2000 WL 710199, at *12 (Del. Ch. May 24, 2000); *cf. Nixon v. Blackwell*, 626 A.2d 1366, 1379-81 (Del. 1993) (explaining that there are no "special rules" or protections for minority stockholders of closely held corporations that are not statutory close corporations).

[128] *Oolie*, 2000 WL 710199, at *12; *see also Acela Invs. LLC v. DiFalco*, 2019 WL 2158063, at *31 (Del. Ch. May 17, 2019) ("The distinction between 'actual' and 'potential' conflicts of interest is important under Delaware law. It has been used to demarcate when a fiduciary wearing two hats can be liable for acting disloyally.").

[129] Pls.' Answering Br. 4-5.

[130] *See id.* at 31-35.

liability for advancing the interests of the VC Funds at the expense of IRL and its common stockholders.

### a. Unicorn Hunting

The plaintiffs claim that the VC Directors' dual fiduciary statuses drove them to cut the VC Funds' losses on a failed investment. "Quickly shuttering IRL" allegedly benefitted the VC Funds because they could "stop investing time and resources into a company they had determined was no longer likely to give them quick and gigantic returns."[131] Although this assertion is in tension with the notion that IRL was on the verge of breakout success, the plaintiffs maintain that the VC Funds were following a standard venture capital playbook.[132] The Complaint observes that the venture capital business model "incentivize[s]" firms "to liquidate even profitable ventures that fall short of their desired returns, particularly when those ventures would require extended investments of time and resources that could be devoted to more promising ventures."[133] Simply put, the plaintiffs say that the VC Funds had decided IRL was not a "unicorn" and decided to move on.[134]

---

[131] *Id.* at 26.

[132] *E.g.*, Compl. ¶ 115.

[133] *Id.* ¶ 117.

[134] Hr'g Tr. 56-57 (arguing that the VC Funds had no interest in restoring IRL's platform after outages because IRL "wasn't a unicorn"); *see generally* Elizabeth Pollman, *Startup Governance*, 186 U. Pa. L. Rev. 155, 157 n.4 (2019) ("Venture capitalist Aileen Lee coined the term 'unicorn' in 2013 to capture the elusive and rare nature of mega-hit ventures in a fund that are worth a billion dollars or more." (citing Aileen Lee, *Welcome to the Unicorn*

There are no particularized allegations supporting this contention. Quite the opposite. It is based on sweeping generalizations about the venture capital industry, supported only by case law making similar observations.[135] For example, the plaintiffs assert that venture capital firms "operate under a business model that causes them to seek outsized returns from a small subset of the investments they make, while expecting many of their investments to fail or generate insignificant returns."[136] It may be that some—even many—venture capital firms take this approach. But this court cannot fairly infer a party's company-specific motives based on industry-wide stereotypes. "Generalities, artistically ambiguous, all-encompassing conclusory allegations are not enough" to satisfy Rule 23.1.[137]

---

*Club: Learning from Billion-Dollar Startups*, TechCrunch (Nov. 2, 2013), https://techcrunch.com/2013/11/02/welcome-to-the-unicorn-club))).

[135] *See* Pls.' Answering Br. 26-27 ("[V]enture capitalists will sometimes liquidate an otherwise viable firm, if its expected returns are not what they (or their investors) expected, or not worth pursuing further, given limited resources and the need to manage other portfolio firms." (quoting *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 51 (Del. Ch. 2013) ("*Trados II*"))); *see also* Compl. ¶¶ 115-17. The only allegations that relate to a specific fund are based on an interview that Chien gave about the venture business generally and his previous firm's investments in Segway and Google. *Id.* ¶¶ 109, 115-16, 146. But those allegations are not about IRL—or even Goodwater.

[136] Compl. ¶ 115.

[137] *Richardson v. Graves*, 1983 WL 21109, at *2 (Del. Ch. June 17, 1983) ("What is required are pleadings that are specific and, if conclusory, supported by sufficient factual allegations that corroborate the conclusion and support the proposition that demand is futile."); *see also IBEW Local Union 481 Defined Contribution Plan and Tr. on Behalf of GoDaddy, Inc. v. Winborne*, 301 A.3d 596, 620 (Del. Ch. 2023) (observing that "permitting a plaintiff to rely on general averments to disqualify a director for demand futility purposes would risk making it too easy to survive a Rule 23.1 motion"); *Zuckerberg*, 262 A.3d at 1063 (holding that generalized allegations that a director benefitted from increased "deal

27

b.    Saving Face

The plaintiffs next contend that the VC Directors benefitted from their scheme to shut down IRL and blame Shafi for its failings because they kept their "reputations intact" and free of public scrutiny.[138]   But Delaware courts reject the idea that directors act improperly "for the purpose of avoiding speculative reputational risk."[139]  The reasoning for doing so is logical: it would be unreasonable to infer that a person strove to protect her reputation by engaging in the sort of misconduct that could destroy it.[140]

The plaintiffs, however, say that this case is different.  They maintain that the VC Directors sought to preserve their professional reputations at a "critical

---

flow" were insufficient to impair his independence without "identify[ing] a single deal . . . expected to flow . . . through th[e] association"); *cf. Paul v. China MediaExpress Hldgs., Inc.*, 2012 WL 28818, at *8 (Del. Ch. Jan. 5, 2012) (explaining that a "vague and general assertion" about "reverse mergers involving foreign corporations and the lack of transparency" was insufficient to satisfy the low credible basis standard in connection with a specific merger).

[138] Pls.' Answering Br. 36.

[139] *Morrison v. Berry*, 2019 WL 7369431, at *14 (Del. Ch. Dec. 31, 2019).

[140] *See id.* at *14 (declining to draw the "unreasonable inference" that directors, motivated by "protecting their reputations as fiduciaries," would have breached their fiduciary duties by engaging in a "sham sale process"); *In re USG Corp. S'holder Litig.*, 2020 WL 5126671 at *25 (Del. Ch. Aug. 31, 2020) (holding that "[g]iven the circumstances alleged by the Plaintiffs," it was not "reasonably conceivable" that the defendants would have, "for the purpose of protecting their reputations as fiduciaries, breached their fiduciary duties, risking the far greater blackening of their fiduciary reputations" (citing *Morrison*, 2019 WL 7369431, at *14)); *see also Rudd v. Brown*, 2020 WL 5494526, at *7, *10 (Del. Ch. Sept. 11, 2020) (dismissing claims for breach of the duty of loyalty because there was "no logical force" to the plaintiffs' "barebones conflict theory" that directors sought to avoid "reputational harm" from a potential proxy contest).

28

fundraising moment" so that their associated VC Funds could "raise and deploy venture capital funds."[141]  Once again, the plaintiffs' argument rests upon a blanket critique of venture capitalists.[142]  They insist that fund-affiliated directors on boards of venture-backed startups are driven to "protect their reputations" so that they can "profit by raising massive amounts of new money from investors (and charg[e] hefty management fees on those funds)."[143]

Because of these purported features of the startup and venture capital communities, the plaintiffs believe that I should look askance at the VC Directors' actions.[144]  To do so would upend the business judgment rule.  This court will not reflexively view directors' conduct with suspicion based upon broad aspersions

---

[141] Pls.' Answering Br. 5, 18, 22, 32; Compl. ¶ 252 (Chien); *see id.* ¶ 255 (Dayal); *id.* ¶ 258 (Maples).

[142] *E.g.*, Compl. ¶¶ 111-12, 268; *see also id.* ¶¶ 79-80 (discussing general financial market conditions in 2022 that put pressure on venture capital firms).

[143] *Id.* ¶ 30; *see also id.* ¶ 108 (stating that venture capital firms raise new funds by "(1) by earning management fees from its assets under management and (2) by taking a portion of the profits generated by its investment funds, also known as 'carried interest'").  The argument regarding Dayal is slightly different and involves her desire to maintain her job at SoftBank and protect its reputation during a challenging time.  *See id.* ¶¶ 84, 105-06.

[144] *E.g.*, Pls.' Answering Br. 37-38; *see also id.* ¶ 35 (discussing how "these venture capitalists promote themselves to the founders of startups they wish to invest in").

about industry clichés.[145]   Nor can these general critiques satisfy the stringent pleading requirements of Rule 23.1.[146]

### c.      Preferential Treatment

Finally, the plaintiffs allege that the VC Directors were conflicted because they put the interests of the VC Funds as preferred stockholders ahead of IRL and its common stockholders by impairing and then dissolving the company.[147]  The VC Funds were preferred stockholders of IRL with liquidation preferences that entitled them to recoup their investments plus an 8% annual dividend amount.[148]  They stood to gain some return on their investments through distributions of IRL's $40 million in cash.[149]  By comparison, common stockholders like the plaintiffs gained nothing.

Delaware courts have observed that directors' fiduciary obligations charge them with pursuing "the best interests of the corporation and its common stockholders, if that can be done faithfully with the contractual promises owed to the

---

[145] *See Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) (explaining that directors are protected by the business judgment rule, which "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the[y acted] in the best interests of the company"), *overruled in part on other grounds by Brehm*, 746 A.2d at 254.

[146] *See supra* note 137 and accompanying text (citing case law explaining that generalities about industries are not particularized allegations for purposes of Rule 23.1).

[147] *See* Pls.' Answering Br. 39-41.

[148] Compl. ¶ 149.

[149] *See id.* ¶ 187 ("In mid-2023, IRL had at least $40 million in cash on hand, and the VC Directors could expect that by quickly shutting down the Company, they could recover and distribute it among the preferred shareholders (*i.e.*, themselves).").

preferred."[150] In *Trados II*, the Court of Chancery expressed that directors should "strive in good faith and on an informed basis to maximize the value of the corporation for the benefit of its residual claimants, the ultimate beneficiaries of the firm's value, not for the benefit of its contractual claimants."[151] The preferred stockholders are contractual claimants, who have contract rights; the common stockholders, who lack contractual protections, are the residual claimants of the company's value. "[I]n circumstances where the interests of the common stockholders diverge from those of the preferred stockholders, it is *possible* that a director could breach her duty by improperly favoring the interests of the preferred stockholders over those of the common stockholders."[152]

Here, the plaintiffs contend that the interests of common and preferred stockholders were misaligned on whether IRL should be liquidated.[153] The Complaint details that IRL was posed for success and growth. IRL had raised capital

---

[150] *LC Cap. Master Fund, Ltd. v. James*, 990 A.2d 435, 452 (Del. Ch. 2010) (citing cases including *Equity-Linked Invs. v. Adams*, 705 A.2d 1040 (Del. Ch. 1997)).

[151] 73 A.3d at 40-41.

[152] *Trados II*, 73 A.3d at 42 (quoting *In re Trados Inc. S'holder Litig.*, 2009 WL 2225958, at *7 (Del. Ch. July 24, 2009) ("*Trados I*"))).

[153] *See* Compl. ¶ 114 ("[T]he interests of IRL's preferred and common stockholders were not and are not aligned with respect to any decision to pursue a transaction that would result in funds being distributed to the preferred stockholders and result in lesser or no consideration for the common stockholders. In a liquidation, the preferred stockholders would recover more than $170 million in proceeds before the common stockholders could get a penny.").

through a Series C round, which occurs when a business is established, generating revenue, and ready to scale.[154] According to the Complaint, within three years of IRL's Series A round, IRL's app had gained widespread popularity and nearly 13 million active users.[155] Its second social media asset, Memix, also gained a solid user base by late 2022.[156]

If this were true, IRL's common stockholders might have favored the use of IRL's $40 million to revive IRL, monetize Memix, and foster the company's potential value.[157] But by taking discretionary steps to dissolve the company, the VC Directors ensured that IRL's social media assets and corresponding financial prospects were lost. Common stockholders were left empty handed, while preferred stockholders would recover *something* through their liquidation preferences—albeit a portion of their total investments.

Yet, the dissolution of IRL was not necessarily a breach of fiduciary duty. The defendants paint a very different narrative. They describe IRL as a failure that

---

[154] *See* Michael Boyles, *5 Strategies for Securing Tech Startup Funding*, Harvard Business School Online (July 18, 2023), https://online.hbs.edu/blog/post/strategies-for-securing-tech-startup-funding ("Series C: Provided when your business has tens of millions of dollars in potential revenue and can grow through product launches, acquisitions, and market expansion").

[155] *See generally* Compl. ¶¶ 60-65; *see also id.* ¶ 72.

[156] *Id.* ¶¶ 74-76.

[157] *See* Pls.' Answering Br. 29-30.

never generated consumer revenue or turned a profit.[158]  They also say that Shafi misled preferred stockholders and the public about the user base for IRL's social media platform.[159]  Instead of having millions of active users, the defendants assert (based on the Keystone Report) that 95% of identified IRL users were automated or bots.[160]

There is a reasonable inference to be drawn that the VC Directors concluded dissolving IRL was the best way to maximize the value of the firm.  If the defendants are right that IRL's business was based on lies about active users on a platform overrun with bots, the common stockholders' prospects were moribund.  As Chancellor Chandler aptly observed in *Trados I*, it is not "necessarily [] a breach of fiduciary duty for a board to approve a transaction that, as a result of liquidation preferences, does not provide any consideration to the common stockholders."[161]  It would unreasonable to punish directors who take an approach that they believe, in good faith, is certain to maximize the value of the corporation simply because a riskier decision could potentially yield some value for common stockholders in the

---

[158] *See* Defs.' Opening Br. 5 (citing Compl. ¶¶ 63, 69, 286).

[159] *Id.* at 1, 7, 17-18.

[160] *Id.* at 17 (quoting Defs' Ex. G).

[161] 2009 WL 2225958, at *7 n.36.

33

future.[162]  Boards should not be expected to make value-destructive choices to drag out the life of a failing company on the off chance that it turns around.[163]

At this stage, however, I must accept as true the plaintiffs' allegations that IRL was poised for success.  I must overlook the defendant-friendly inference that the VC Directors made a wise business decision that maximized firm value.  Instead, I must draw the plaintiff-friendly inference that the VC Directors gave no consideration to their obligations to common stockholders and focused only on the preferred stockholders' interests.

This plaintiff-friendly inference is supported by particularized facts suggesting that the VC Directors were indifferent to the interests of common

---

[162] *See generally* Robert P. Bartlett, III, *Shareholder Wealth Maximization as Means to an End*, 38 Seattle U. L. Rev. 255 (2015) (questioning the rationale of charging directors with an immutable duty to maximize value for common stockholders and articulating how contingency directors can exercise bargaining power to maximize firm value).

[163] *See Prod. Res. Gp., L.L.C. v. NCT Gp., Inc.*, 863 A.2d 772, 791 n.60 (Del. Ch. 2004) (noting in the context of a distressed entity that "[t]he maximization of the economic value of the firm might . . . require the directors to undertake the course of action that best preserves value in a situation when the procession of the firm as a going concern would be value-destroying" such that "the efficient liquidation of an insolvent firm might well be the method by which the firm's value is enhanced"); *see also Credit Lyonnais Bank Nederland, N.V. v. Pathe Commc'ns Corp.*, 1991 WL 277613, at *34 n.55 (Del. Ch. Dec. 30, 1991) ("[I]n managing the business affairs of a solvent corporation in the vicinity of insolvency, circumstances may arise when the right . . . course to follow for the corporation may diverge from the choice that the stockholders (or the creditors, or the employees, or any single group interested in the corporation) would make if given the opportunity to act."); *see also* Pollman, *supra* note 134, *Startup Governance*, at 206 (discussing the potential destruction of economic and social value that may be perpetuated by startups with lackluster financial performance or compliance failures).

stockholders.[164] The Complaint explains that the decision to dissolve IRL was hastily made, without any semblance of a process, exploration of alternatives, or thought to common stockholders' interests.[165] The VC Directors allegedly formed an entity called IRL LIQUIDATION, LLC the week before the Board first met to discuss dissolution.[166] This entity was formed even before the Special Committee, which consisted only of the VC Directors, received the Keystone Report. Setting aside whether liquidating IRL was the value-maximizing choice, the VC Directors may face a substantial risk of liability if they paid singular focus to maximizing preferred returns without any consideration of options that might have benefitted common stockholders.[167]

---

[164] *Ironworkers Dist. Council of Phila. & Vicinity Ret. & Pension Plan v. Andreotti*, 2015 WL 2270673, at *27 (Del. Ch. May 8, 2015) ("For the actions of directors to have been in bad faith, the directors must have acted with scienter, *i.e.*, with a motive to harm, or with indifference to harm that will necessarily result from the challenged decision . . . ."); *see also Ryan v. Gifford*, 918 A.2d 341, 357 (Del. Ch. 2007) (explaining that bad faith can "include any action that demonstrates a faithlessness or lack of true devotion to the interests of the corporation and its shareholders").

[165] Compl. ¶¶ 17, 28, 230-31, 233-34; *see generally* Steven E. Bochner & Amy L. Simmerman, *The Venture Capital Board Member's Survival Guide: Handling Conflicts Effectively While Wearing Two Hats*, 41 Del. J. Corp. L. 1, 21-27 (2016) (describing the sort of process that venture-affiliated directors should strive to follow in making decisions that differently affect common and preferred stockholders).

[166] Compl. ¶ 205.

[167] *See Trados II*, 73 A.3d at 64 (addressing that the board did not consider the common stock whatsoever in making an acquisition decision that only benefitted preferred stockholders).

Accordingly, demand is not futile on Count I as to any of the VC Directors.[168]

### 2. Breach of Fiduciary Duty Against Kauffman

The plaintiffs allege that Kauffman (as acting CEO and a director of IRL) breached his duty of loyalty by "elevat[ing] the interests of the VC Directors over the interests of the Company and its stockholders."[169] It is not immediately evident why Kauffman would do so. The Complaint states that Kauffman was a "longtime loyal ally" of Chien.[170] It also suggests that Kauffman was "beholden" to the VC Directors because he depends on "other funds like theirs for employment."[171] Neither of these conclusory statements are adequate under Rule 23.1 to support an inference that Kauffman lacked independence from any of the VC Directors or VC Funds.

Nevertheless, I conclude that demand on this claim is futile. Kauffman's alleged misconduct was part and parcel of the VC Directors' "scheme" to shut down IRL.[172] The plaintiffs allege that "Kauffman's actions proximately caused the

---

[168] One of the arguments raised in Count I concerns potential breaches of fiduciary duty for violating IRL's bylaws. This relates to the plaintiffs' direct claim in Count II for breach of the bylaws, which I conclude states a claim. *See infra* Section II.B.1.

[169] Compl. ¶ 288.

[170] *Id.* ¶ 20; *see also id.* ¶ 288 (alleging that Chien and Kauffman had "a decades-long relationship").

[171] *Id.* ¶ 263.

[172] *See supra* notes 122-23 (citing the Complaint).

destruction of what had been a billion-dollar-plus business, wiping out all the Company's value."[173] These actions include "the Board vote[] to dissolve IRL" and "destroying the value of IRL (and thus the value of the common stock)."[174]

As discussed above, the same deeds support a finding of demand futility against the VC Directors.[175] The VC Directors, as three members of the five-person Board (with three of six Board votes), could not impartially consider a claim about the same issues on which they face liability themselves.[176] Nor could Kauffman, who likewise purportedly failed to consider IRL's stockholders as a whole (including its common stockholders) when he set out to "preserve whatever investor capital he could—for the VC investors."[177]

---

[173] Compl. ¶ 292.

[174] *Id.* ¶ 291.

[175] *See supra* Section II.A.1.

[176] *See Grabski on behalf of Coinbase Global, Inc. v. Andreesssen*, 2024 WL 390890, at *12 (Del. Ch. Feb. 1, 2024) ("Where the factual allegations underlying claims against officers are 'congruous' with the facts underlying claims against directors, then adequately alleging a substantial likelihood of liability as to the directors satisfies the demand requirement concerning the claims against the officers." (quoting *In re CBS Corp. S'holder Class Action & Deriv. Litig.*, 2021 WL 268779, at *47 (Del. Ch. Jan. 27, 2021))); *Teamsters Local 433 Health Servs. & Ins. Plan v. Chou*, 2020 WL 5028065, at *26 (Del. Ch. Aug. 24, 2020) (explaining that demand on a claim against an officer was futile where the board's investigation into the claim would "necessarily implicate the same set of facts" as a claim against the board for which demand was futile). By the same logic, Kauffman could not impartially consider a demand on Count I.

[177] *See* Compl. ¶ 149 (alleging that Kauffman told IRL employees he was experienced in winding down companies to return investments to investors).

The Complaint also states that Kauffman breached his duty of loyalty "by wrongfully voting [common stockholders'] shares in favor of removing Abraham Shafi from the Board and electing himself to the Board in Shafi's place."[178] Kauffman stood to benefit from this vote because he gained a Board seat.[179] He allegedly (and invalidly) cast the common stockholders' votes to install himself on the Board, despite knowing that the common stockholders were "opposed" and that they had just 24 hours' notice of the request to vote.[180] These allegations support a conclusion that Kauffman, too, faces a substantial likelihood of liability.[181]

In addition, the Complaint sets out specific facts to support a reasonable inference that Kauffman faces a substantial likelihood of breaching his duty of care to IRL and its stockholders. As an officer of IRL, Kauffman would not be exculpated for a duty of care violation. The plaintiffs allege that he displayed a reckless disregard for IRL's business and employees.[182] For instance, after significant

---

[178] *Id.* ¶ 289.

[179] *Id.*

[180] *Id.* ¶¶ 289-90.

[181] *See* Voting Agreement § 4.2 (granting proxy voting authority to IRL's President only after a party either fails to vote or attempts to vote in a manner inconsistent with the terms of the Voting Agreement).

[182] *See Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *4 (Del. Ch. Aug. 26, 2005) (describing the sort of "gross negligence" allegations that support a duty of care claim including a "devil-may-care attitude or indifference amounting to recklessness" (citation omitted)); *see also In re Baker Hughes Inc. Merger Litig.*, 2020 WL 6281427, at *15 (Del. Ch. Oct. 27, 2020) ("To plead gross negligence, a plaintiff must allege 'conduct

outages, Kauffman purportedly dismissed senior employees' plans to bring IRL's platform back online and reengage with users.[183] This lack of care was allegedly in furtherance of Kauffman's effort to facilitate value-extraction by the preferred stockholders.

Demand is therefore futile on Count III as to the VC Directors and Kauffman.

### 3. Vicarious Liability Against the VC Funds

The plaintiffs attempt to extend vicarious liability to the VC Funds for actions taken by the VC Directors that were a "proximate cause of IRL's injuries."[184] Specifically, they seek to hold SoftBank accountable for Dayal's actions, Goodwater accountable for Chien's actions, and Floodgate accountable for Maples' actions. The plaintiffs cite to agency principles, alleging that VC Directors' actions were within the scope of their employment by and for the benefit of the VC Funds.[185]

This claim fails as a matter of law.

---

that constitutes reckless indifference or actions that are without the bounds of reason.'" (quoting *Morrison*, 2019 WL 7369431, at *22)).

[183] *See* Compl. ¶ 167.

[184] *Id.* ¶¶ 306-09. The only claim against the VC Directors for causing derivative harm to IRL is Count I. The plaintiffs assert in their answering brief that Count V could "be maintained against the [VC Funds] for *direct* claims." Pls.' Answering Br. 48 n.14. But Count V is expressly styled as a claim "ON BEHALF OF IRL" and speaks only of the VC Directors' actions that harmed IRL. *See* Compl. 123 (heading to Count V). The plaintiffs cannot amend their pleading through briefing. *See Cal. Pub. Emps. Ret. Sys. v. Coulter*, 2002 WL 31888343, at *12 (Del. Ch. Dec. 18, 2002) ("Arguments in briefs do not serve to amend the pleadings.").

[185] Compl. ¶¶ 306-09.

In *Khanna v. McMinn*, the Court of Chancery rejected a similar attempt to hold a non-fiduciary stockholder liable for the acts of its board designee.[186] There, a company's co-founder brought breach of fiduciary duty claims against current and former board members.[187] The co-founder also sought to impose liability under the doctrine of respondeat superior on a venture capital firm associated with certain board members. The court explained that the co-founder's attempt to hold the firm, which was not a fiduciary of the company or its stockholders, liable for acts of its purported agent-directors lacked support in Delaware law. It noted that to impose liability on the firm through the common law tort doctrine of respondeat superior 'would work an unprecedented, revolutionary change in our law, and would give investors in a corporation reason for second thoughts about seeking representation on the corporation's board of directors.'"[188]

The plaintiffs here ask that I interpret *Khanna* narrowly as standing only for the proposition that "a stockholder's mere appointment or nomination of an independent director cannot *alone* form the basis for respondeat superior liability."[189] To bolster this argument, they rely on cases in the aiding and abetting

---

[186] 2006 WL 1388744, at *28 (Del. Ch. May 9, 2006).

[187] *Id.*

[188] *Id.* (quoting *Emerson Radio Corp. v. Int'l Jensen, Inc.*, 1996 WL 483086, at *20 n.18 (Del. Ch. Aug. 20, 1996)).

[189] Pls.' Answering Br. 48, 49 n.15.

context.[190]  But claims for aiding and abetting breach of fiduciary duty are distinct from claims for vicarious liability for breach of fiduciary duty.  The former involves a non-fiduciary defendant's "knowing participation" in a breach, and the latter focuses on the principal-agency relationship through which liability flows.[191]

The plaintiffs have not brought an aiding and abetting claim against the VC Funds.  They have not pleaded knowing participation by the VC Funds, which requires a showing of "active participation" in the misconduct.[192]  It would be inconsistent with Delaware law to permit the plaintiffs to bypass this deficiency and extend liability to the non-fiduciary VC Funds using the doctrine of respondeat superior.[193]

---

[190] *Id.* at 48 (citing *In re PLX Tech. Inc. S'holders Litig.*, 2018 WL 5018535, at *50 (Del. Ch. Oct. 16, 2018)).

[191] *See Malpiede v. Townson*, 780 A.2d 1075, 1097 (Del. 2001) (explaining that "the third party [must] act with the knowledge that the conduct advocated or assisted constitutes such a breach" to give rise to aiding and abetting liability); *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 1995 WL 376919, at *8 (Del. Ch. June 15, 1995) ("*Respondeat superior* imposes liability upon a principal for the torts of his agent committed within the scope of their agency relationship.").

[192] *In re Mindbody, Inc. S'holder Litig.*, --- A.3d ---, 2024 WL 4926910, at *33 (Del. Dec. 2, 2024) (explaining that "participation in an aiding and abetting claim requires that the aider and abettor provide 'substantial assistance' to the primary violator," which requires "active participation rather than 'passive awareness'" (citation omitted)).

[193] *See Khanna*, 2006 WL 1388744, at *28; *Emerson Radio*, 1996 WL 483086, at *20 n.18 (rejecting the idea that liability for a breach of fiduciary duty could be extended to a non-fiduciary fund based on the actions of its board designee); *Firefighters' Pension Sys. of City of Kansas City, Missouri Tr. v. Presidio, Inc.*, 251 A.3d 212, 286 (Del. Ch. 2021) (stating that Delaware courts "reject[] the use of agency principles like *respondeat superior* to impose liability on a stockholder for the acts of its director representative"); *see also USAirways Grp., Inc. v. British Airways PLC*, 989 F. Supp. 482, 494 (S.D.N.Y. 1997)

Accordingly, Count V is dismissed.

## B.    Direct Claims

The defendants also seek dismissal of the Complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim on which relief can be granted.[194]  The standard that governs the motion is as follows:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and [(iv)] dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[195]

The court will neither "blindly accept conclusory allegations unsupported by specific facts" nor "draw unreasonable inferences in the plaintiffs' favor."[196]  It will accept "only those reasonable inferences that logically flow from the face of the complaint and is not required to accept every strained interpretation of the allegations proposed by the plaintiff."[197]

---

(denying recovery under a respondeat superior theory for breach of fiduciary duty because it would "undermine" and "circumvent[] clear limitations imposed by Delaware corporate law").

[194] Defs.' Opening Br. 27 n.16, 52.

[195] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (citations omitted).

[196] *Gantler v. Stephens*, 965 A.2d 695, 704 (Del. 2009) (citation omitted).

[197] *Id.*

### 1. Breach of Fiduciary Duty for Bylaw Violations

Count II is a direct claim for breach of fiduciary duty against the VC Directors for violating IRL's corporate bylaws.[198] The plaintiffs allege that the VC Directors—acting as members of the Special Committee—intentionally violated IRL's bylaws in two ways. First, they failed to appoint Desai (IRL's President) the CEO after Shafi's suspension for placing personal expenses on a company credit card.[199] And second, they appointed Kauffman as CEO.[200]

IRL's bylaws permit the Board to fill vacant officer positions. Section 29(a) of the bylaws states:

> Any officer elected or appointed by the Board of Directors may be removed at any time by the Board of Directors. If the office of any officer becomes vacant for any reason, ***the vacancy may be filled by the Board of Directors***, or by the Chief Executive

---

[198] Compl. ¶¶ 279-82. In their motion to dismiss briefs, both parties address Count II as though it were derivative. Defs.' Opening Br. 40-42; Pls.' Answering Br. 42-44. But the claim is pleaded as a direct one. The plaintiffs seek compensatory damages for alleged injuries to Shafi, Desai, and Khachatryan. Compl. ¶ 282. As noted above, the plaintiffs' derivative breach of fiduciary duty claims also include allegations about breaching the bylaws. I address the merits here rather than above because Count II is a standalone claim about a breach of the bylaws. Although the plaintiffs describe harm to Desai (and perhaps Shafi), they also assert that the bylaw violations had the effect of harming IRL. *E.g.*, *id.* ¶ 281. I decline to perform a *Tooley* analysis that the parties did not ask me to undertake. Whether the claim is direct or derivative will need to be resolved at a later stage of the case after briefing on the subject.

[199] *See id.* ¶¶ 279-80.

[200] *Id.*

Officer *or other officer if so authorized* by the Board of Directors.[201]

If the CEO position is vacant, the bylaws contemplate that the President "will be" the CEO. Section 29(c) of the bylaws states:

> If the office of Chief Executive Officer is vacant, *the President will be the chief executive officer of the corporation* (including for purposes of any reference to Chief Executive Officer in these Bylaws) and will, subject to the control of the Board of Directors, have general supervision, direction and control of the business and officers of the corporation.[202]

Despite being President, Desai did not ascend to the CEO position after Shafi's suspension. The plaintiffs assert that this violated Section 29(c) of the bylaws. Rather than allow Desai to step into the CEO role, the Special Committee—not the full Board—appointed Kauffman. The plaintiffs assert that this violated Section 29(a) of the bylaws.[203] Because these bylaw violations were allegedly part of the VC Directors' plan to take over and shut down IRL, the plaintiffs claim that their actions breached the directors' duties of loyalty.[204]

---

[201] Defs.' Ex. K (Am. and Restated Bylaws of Get Together, Inc.) § 29(a) (emphasis added); *see* Compl. ¶ 142.

[202] Defs.' Ex. K § 29(c) (emphasis added); *see* Compl. ¶ 143.

[203] Compl. ¶ 280.

[204] *Id.*; *cf. Boilermakers Local 154 Ret. Fund v. Chevron Corp.*, 73 A.3d 934, 954 (Del. Ch. 2013) (remarking that "as with all exercises of fiduciary authority," the "real world application" of a corporate bylaw "can be challenged as an inequitable breach of fiduciary duty" (citing *Schnell v. Chris-Craft Indus., Inc.*, 285 A.2d 437, 439 (Del. 1971))).

It is unclear whether the CEO position became "vacant" as contemplated by Section 29(c) of the bylaws since Shafi was suspended—not removed. Kauffman was allegedly appointed CEO "[i]n tandem" with Shafi's suspension.[205] Nevertheless, based on the allegations in the Complaint, it is reasonably conceivable that Kauffman's appointment violated Section 29(a).[206]

In arguing otherwise, the defendants contend that the Special Committee was vested with broad authority.[207] They point out that Section 29(a) of the bylaws permits the Board to delegate its appointment powers to any "other officer so authorized by the Board of Directors."[208] They further cite to the Special Committee's authorizing resolutions, which grant it "all the powers of the Board necessary to carry out its purpose and responsibilities with respect to its review, investigation, and resolution of the Allegations" raised in the SEC investigation.[209]

There are two problems with this argument. First, the bylaws contemplate delegation to an "officer"—not a Board committee. Second, the Special Committee's authorizing resolutions do not clearly delegate to it the Board's

---

[205] Compl. ¶ 140.

[206] Were the claim derivative, the allegations discussed in this section would also meet the Rule 23.1 standard. The plaintiffs' claim is supported by the text of the bylaws and particularized facts.

[207] Defs.' Opening Br. 40.

[208] *Id.* (quoting Defs.' Ex. K § 29(a)).

[209] *Id.* (quoting Defs.' Ex. D).

authority to remove the CEO.  The resolutions explain that the Special Committee was formed to:

> review, investigate, resolve, and decide what action, if any, the Company should take in response to, in any manner that the Special Committee deems appropriate or necessary in the exercise of its unfettered discretion, the Allegations, as well as any related facts, allegations, circumstances, or issues that may be brought to the Special Committee's attention as a result of its review.[210]

 "Allegations" is a defined term that refers to any "allegations of wrongdoing against the Company or the Company's management" made by the SEC.[211]

It may be that the Special Committee learned about Shafi's purported credit card misuse during its investigation into the subjects of the SEC inquiry.  If the defendants' reading of the resolutions is correct, perhaps the Special Committee had the power to suspend Shafi.  But to dismiss Count II on that basis would require me to accept facts and inferences presented by the defendants, in contravention of the operative standard.  I cannot say, as a matter of law, that the Special Committee had the authority to *appoint* a new CEO given the terms of Section 29(a) of the bylaws.

The motion to dismiss is therefore denied as to Count II.

---

[210] Defs.' Ex. D at 1.

[211] *Id.*; *see* Compl. ¶ 121.

## 2. Breach of the Voting Agreement

Count IV seeks to impose liability on IRL for breaching the Voting Agreement.[212] This is a breach of contract claim.[213] "Under Delaware law, the elements of a breach of contract claim are: 1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiff."[214]

Section 4.2 of the Voting Agreement, which is among the Company and certain of its investors, confers proxy voting on the "President and Treasurer of the Company."[215] The provision provides, in relevant part:

> Each party to this Agreement hereby constitutes and appoints as the proxies of the party and hereby **grants a power of attorney to the President and Treasurer of the Company**, . . . with full power of substitution, with respect to the matters set forth herein, including without limitation, election of persons as members of the Board in accordance with Section 1 hereto . . . and hereby **authorizes each of them to represent and to vote, if and only if the party** (i) **fails to vote** or (ii) attempts to vote (whether by proxy, in person or by written consent), in a manner which is inconsistent with the terms of this Agreement, all of such party's

---

[212] The plaintiffs' original complaint brought this claim against Kauffman. *See* Dkt. 1. Kauffman is not a party to the Voting Agreement. The amended Complaint now brings the claim against IRL.

[213] *See Grayson v. Imagination Station, Inc.*, 2010 WL 3221951, at *7 (Del. Ch. Aug. 16, 2010) (referring to a breach of voting agreement claim as a breach of contract claim and rejecting an argument that related claims could be separate fiduciary duty claims); *Tex. Pac. Land Corp. v. Horizon Kinetics LLC*, 306 A.3d 530, 547 (Del. Ch. 2023) ("The claim for breach of the Voting Agreement is a claim for breach of contract."), *aff'd*, 314 A.3d 685 (Del. 2024); *see also* Defs.' Opening Br. 52; Pls.' Answering Br. 50.

[214] *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003) (citation omitted).

[215] Compl. ¶¶ 297-98.

Shares in favor of the election of persons as members of the Board.[216]

The plaintiffs assert that the Company, through Kauffman, violated the Voting Agreement when Kauffman purported to vote Shafi's, Desai's, and Khachatryan's shares to remove Shafi from the Board and appoint himself in Shafi's place.[217] They assert that this constituted a breach of Section 4.2 of the Voting Agreement for two reasons. First, Kauffman "was not properly appointed President of IRL" and lacked the authority to vote the shares.[218] Second, Shafi, Desai, and Khachatryan had not "failed to vote" but only failed to meet the "arbitrary deadline" of 24 hours after notice of the request to vote.[219]

The defendants argue that Kauffman had validly been appointed President of IRL by the Special Committee.[220] Again, the defendants say that the Special Committee had "broad authority" to make the appointment.[221] This argument is not dispositive for the reasons explained above.[222] Without resolving whether the

---

[216] Voting Agreement § 4.2 (emphasis added).

[217] Compl. ¶ 299.

[218] *Id.* ¶ 300. As with their argument about Kauffman's appointment as CEO, the plaintiffs maintain that the Special Committee lacked the authority to appoint Kauffman as President. *See* Pls.' Answering Br. 51.

[219] Compl. ¶ 301.

[220] Defs.' Opening Br. 52; *see also* Compl. ¶ 225 (alleging that the "Special Committee had purported to appoint Kauffman as President of IRL in late May 2023").

[221] Defs.' Opening Br. 52.

[222] *See supra* at 46-47.

Special Committee had the power to appoint Kauffman, I cannot determine whether he could properly act as a proxy.[223]

That alone is grounds to deny the motion to dismiss on Count IV. I need not address whether the failure to sign a written consent within 24 hours (when a Board meeting was scheduled for the day after the request was made) constitutes a "failure to vote" under Section 4.2 of the Voting Agreement.

### 3. Tortious Interference

Count VI is a claim for tortious interference with prospective economic advantage.[224] The plaintiffs allege that the defendants' misconduct "destroyed the value of stock options [they] held in IRL," which the plaintiffs "intended to exercise or sell."[225] To prevail, the plaintiffs must demonstrate the existence of "(a) the reasonable probability of a business opportunity, (b) the intentional interference by [the] defendant with that opportunity, (c) proximate causation, and (d) damages."[226]

To show a reasonable probability of a business opportunity, the plaintiffs must sufficiently plead "an actionable expectancy."[227] Delaware courts have held that

---

[223] Also, if Kauffman was not President, it is unclear whether he could be deemed to have acted on behalf of the Company—the defendant named in this count. Again, Kauffman was not a party to the Voting Agreement.

[224] Compl. ¶¶ 310-19.

[225] *Id.* ¶ 311.

[226] *Malpiede*, 780 A.2d at 1099 (citation omitted).

[227] *Blue v. Fireman*, 2022 WL 593899, at *18 (Del. Ch. Feb. 28, 2022).

49

"mere ownership of stock options is insufficient to show a *bona fide* expectancy to support a claim for tortious interference with prospective business relationships."[228] That is because "[o]ptions, like other derivative securities, inherently involve risk."[229] "Mere hope" or "innate optimism" that the options have worth is insufficient to demonstrate that a business opportunity was "reasonably probable."[230]

The plaintiffs have put forward more than a vague hope that their options had the potential for profit. According to the Complaint, many of the plaintiffs' options were issued before the Series C round and had a strike price of $0.32 per share.[231] They were allegedly "in the money" at the time of the Series C transaction in 2021 and after, when IRL had a valuation exceeding that amount.[232] Series C investors purchased IRL stock in May 2021 at a price of $22.63 per share.[233] As of 2022, a 409A valuation assessed IRL's common stock at $4.50 per share.[234]

But the plaintiffs make no attempt to plead that they intended to exercise their stock options. Demonstrating a bona fide expectancy involves the identification of "a specific party who was prepared to enter into a business relationship but was

[228] *Bocock v. INNOVATE Corp.*, 2022 WL 15800273, at *26 (Del. Ch. Oct. 28, 2022).

[229] *Blue*, 2022 WL 593899, at *18.

[230] *Agilent Techs., Inc. v. Kirkland*, 2009 WL 119865, at *7 (Del. Ch. Jan. 20, 2009).

[231] Compl. ¶ 313.

[232] *Id.*

[233] *Id.* ¶ 314.

[234] *Id.* ¶ 313.

dissuaded from doing so by the defendant."[235]   The plaintiffs offer only that third parties "expressed clear interest" in acquiring the securities.[236]   The Complaint is silent on whether the plaintiffs ever sold or exercised, or took any steps to sell or exercise, their interests in IRL.[237]

The plaintiffs also have not met the "intentional interference" element.  They neglect to allege that the defendants even knew about their stock options or of any intention the plaintiffs had to sell them.[238]   The plaintiffs argue in their answering brief that the "[d]efendants were on the Board and must have known that the stock options existed."[239]   This assertion does not appear in the Complaint.  Even if it did, the plaintiffs do not explain how the defendants would have known about any third

---

[235] *Agilent Techs.*, 2009 WL 119865, at *7 (citation omitted); *see also Carney v. B&B Serv. Co.*, 2019 WL 5579490, at *2 (Del. Super. Oct. 29, 2019) (ORDER) (stating that a plaintiff "must identify a specific party who was prepared to enter into a business relationship with the plaintiff" (citation omitted)).

[236] Compl. ¶ 316 (stating that Desai was contacted by a potential buyer for his stock and options in February 2022).

[237] *See Jing Jing v. Weyland Tech, Inc.*, 2017 WL 2618753, at *4 (D. Del. June 15, 2017) (holding that a plaintiff "fail[ed] to allege tortious interference with prospective business advantage" when she "allege[d] only that she intends to sell her shares to unnamed third party purchasers").

[238] *See KT4 P'rs LLC v. Palantir Techs. Inc.*, 2021 WL 2823567 at *14 (Del. Super. June 24, 2021) (explaining that Delaware law requires "proof of the defendant's knowledge about the plaintiff's prospective deal.").

[239] Pls.' Answering Br. 56.

party offers to acquire the options. Absent knowledge of the business opportunity, there can be no intentional interference.[240]

Count VI is dismissed for failure to plead the elements of a tortious interference with prospective economic advantage claim.

## C. The Motion to Stay

If the Complaint is not dismissed, the defendants ask, in the alternative, that I stay the case pending resolution of the California Action.[241] I decline to grant a stay.

The framework guiding a Delaware court's discretion to grant or deny a motion to stay is outlined in *McWane Cast Iron Pipe Corp. v. McDowell-Wellman Engineering Co.*[242] "Under the *McWane* doctrine, the court's discretion to grant a stay should be freely exercised where 'there is a prior action pending elsewhere, in a court capable of doing prompt and complete justice, involving the same parties and the same issues.'"[243] The court is guided by "considerations of comity and the necessities of an orderly and efficient administration of justice."[244]

---

[240] *See DG BF, LLC v. Ray*, 2021 WL 776742, at *18 n.146 (Del. Ch. Mar. 1, 2021) (explaining that the "interferer's knowledge of the expectancy" is implicit in the *Malpiede* test "which focuses on intent" (quoting *Am. Homepatient, Inc. v. Collier*, 2006 WL 1134170, at *5 (Del. Ch. Apr. 19, 2006))).

[241] Defs.' Opening Br. 60-66.

[242] 263 A.2d 281, 283 (Del. 1970).

[243] *In re Lordstown Motors Corp. S'holders Litig.*, 2022 WL 678597, at *2 (Del. Ch. Mar. 7, 2022) (citing *McWane*, 263 A.2d at 283).

[244] *McWane*, 263 A.2d at 283.

The California Action, initiated by SoftBank against Shafi in July 2023, was filed before this suit.

The California Action involves claims of federal securities fraud and conspiracy, unjust enrichment, and aiding and abetting under California law.[245] The claims here, by contrast, are brought under Delaware law and involve alleged breaches of fiduciary duty. There is some factual overlap insofar as both courts may need to resolve whether IRL predominantly hosted bots or authentic human users.[246] This overlapping issue of fact may bear on the defendants' affirmative defenses and the plaintiffs' access to equitable relief. But there are different time periods at play. The California Action is concerned with whether affirmative misrepresentations about IRL's active users were made to SoftBank when it invested in 2021. This case centers on whether the platform had millions of active human users when the Keystone Report was issued and IRL was shut down in 2023.

The parties are also dissimilar. Of the twenty parties involved in this action, only four are named in the California Action.[247] None of the defendants here are parties to the California Action. The plaintiff in that action is a different SoftBank

---

[245] *See generally* Cal. Compl.

[246] *Compare* Compl. ¶ 1, *with* Cal. Compl. ¶ 4. The Complaint here alleges that the statement about IRL's overwhelming bot population was a "lie." Compl. ¶¶ 1-3, 9-10, 195, 202-03). The California Complaint asserts the opposite. Cal. Compl. ¶¶ 5-6, 13-14, .

[247] Four of the plaintiffs in this action are defendants in the California Action: Khachatryan, Abraham Shafi, Noah Shafi, and Shehab Amin. *See generally* Cal. Compl.

entity than the SoftBank-affiliated defendant here. None of the remaining eight defendants nor their corporate affiliates are involved in the California Action.

The California court therefore cannot do "prompt and complete justice" that extends to the parties here. The presence of bots at the time of the Series C round will have little bearing on the resolution of the claims before me. As such, I hardly see a risk of conflicting rulings. I decline to stay this case while litigation among completely different parties involving a different timeframe and separate legal theories proceeds in California.

The motion to stay is therefore denied.

## III. CONCLUSION

The motion to dismiss the derivative claims under Rule 23.1 is denied, except that Count V fails as a matter of law and is dismissed. The motion to dismiss the direct claims under Rule 12(b)(6) is granted in part insofar as Count VI is dismissed, and otherwise denied. The motion to stay is also denied.

The parties are asked to meet and confer on a schedule to govern this action, and to file a proposed scheduling order within 30 days.